IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **DEANNA NIGRO, individually and as Administratrix of Estate of Joseph R. Nigro, Jr.,** | ) ) ) ) | **CASE NO. 1:06 CV 112** |
| **Plaintiff,** | ) ) | |
| vs. | ) ) | **Judge Peter C. Economus** |
| **CITY OF STRONGSVILLE,** | ) ) ) | |
| **Defendant.** | ) | **MEMORANDUM AND ORDER** |

This matter is before the Court upon Defendant City of Strongsville's ("Strongsville") Motion for Summary Judgment. (Dkt. #21). Also before the Court is Plaintiff's memorandum in opposition to summary judgment, (Dkt. #23), filed by Plaintiff Deanna L. Nigro ("Plaintiff"), individually and as Administratrix of the Estate of Joseph Nigro, deceased. For the following reasons, Strongsville's motion is **GRANTED**.

### I. FACTUAL BACKGROUND

On February 1, 2005, Joseph R. Nigro, Jr. ("Nigro") was found hanging from a bed sheet in the Strongsville City Jail. (Complaint ¶ 9). Prior to his suicide, Nigro was arrested by the City of Strongsville Police Department in the vicinity of his wife's workplace for threatening to hurt himself and his wife. (Complaint ¶ 4). Nigro was charged with carrying a concealed weapon and menacing by stalking. (Complaint ¶ 5). The following facts occurred from the time when Nigro was detained until his death, some of which are disputed by the parties.

Following his arrest, Nigro was transported first to Southwest General Hospital and later to

the Oakwood Behavior Health Center for psychiatric observation and care. (Complaint ¶ 5).  After about a week, Nigro was discharged from Oakwood Behavior Health Center with prescription medications to address depression and bi-polar disorder.  (Complaint ¶ 7).  Nigro was then taken to the Strongsville City Jail.  (Complaint ¶ 6).

During the booking process, Corrections Officer Brian Kadlec ("Kadlec") questioned Nigro regarding his current mental state.  Nigro confirmed that he had attempted suicide in the past but was not contemplating it at that time. (Dkt. #23-7 at 21).  Nigro informed Kadlec that he had attempted suicide with a gun several days earlier and that there was a history of suicide in his family. (Dkt. #23-7 at 21).  Nigro told Kadlec that while he had not been taking his prescriptions regularly for his bipolar condition prior to his arrest, he had resumed taking his medications while at Oakwood.  (Dkt. #23-7 at 1).  Kadlec states that while Nigro was concerned about his situation, he did not appear withdrawn or reclusive and was friendly and inquisitive about the process.  (Dkt. #23-7 at 1-2).

Molly Chan ("Chan"), Jail Program Coordinator for the City of Strongsville, first had contact with Nigro on Monday, January 31, 2005, the same day of Nigro's preliminary arraignment. (Dkt. #23-4 at 1).  Following the hearing, Chan spoke with Nigro at length about his situation, and he seemed concerned and agitated, and began to cry.  (Dkt. #23-4 at 1).  However, after Chan explained that Nigro's parents were looking for an in-patient facility for him and explained that this situation was temporary, Nigro stopped crying and appeared friendly and outgoing for the rest of the day.  (Dkt. #23-4 at 1).  Chan asked Nigro if he was thinking of harming himself.  He said he was not, but that he was bi-polar and needed help.  (Dkt. #23-4 at 2).  Chan told Nigro that someone at the jail would get refills for his prescription medications if necessary.  (Dkt. #23-4 at 2).  At the

end of her shift, Chan informed the jail staff that Nigro should be placed on Special Needs Watch, in which he would be checked approximately every 20-30 minutes, due to his bi-polar condition and mood swings. (Dkt. #23-4 at 2). As Chan did not believe Oakwood would have discharged Nigro had he been suicidal, she did not order him placed on Suicide Watch. (Dkt. #23-4 at 2).

Corrections Officer William Brewer ("Brewer") was on duty on February 1, 2005, and in charge of checking on Nigro's cell block. (Dkt. #23-9 at 1). Brewer was notified that he needed to pay special attention to Nigro. (Dkt. #23-9 at 1). According to Brewer's affidavit, he checked on Nigro three times between 2:45 p.m. and 5:30 p.m. (Dkt. #23-9 at 1). According to the Special Needs Watch Log, however, Brewer checked Nigro seven times between 2:45 p.m. and 5:30 p.m., at half-hour increments. (Dkt. 23-6 at 3).[1] At 5:30 p.m., before leaving to pick up meals for prisoners, Brewer observed Nigro watching television from his cell. (Dkt. #23-9 at 1). When Brewer returned to the cell area he found Nigro hanging from a piece of cloth outside a jail cell. (Dkt. #23-9 at 1-2). Brewer immediately tried to release the tension of the cloth around his neck and called the paramedics for assistance. (Dkt. #23-9 at 2).

Detective Wayne Feuerstein ("Feuerstein") investigated Nigro's suicide for Strongsville. Feuerstein concluded that Nigro hung himself within three to four minutes after Brewer last observed Nigro at 5:30 p.m. (Dkt. #21-5 at 2).

According to Deputy Chief of Police James Kobak ("Kobak"), the State of Ohio Department of Rehabilitation and Correction inspects the Strongsville City Jail each year. (Dkt. #21-6 at 1). Since 1998, the last year in which records are available, the jail has passed each inspection, which

---

[1] Plaintiff contends that the Special Needs Watch Log was not completed until well after Nigro's suicide, however, and may not be accurate. Plaintiff has not provided any support for this allegation, though.

-3-

includes a review of the policies and procedures. (Dkt. #21-6 at 1). Particularly, in May 2003, the Department of Rehabiliation and Correction inspected the jail with respect to the suicide prevention policies and procedures. (Dkt. #21-6 at 1). The Strongsville City Jail passed this inspection. (Dkt. #21-6 at 1, 4). Kobak asserts that prior to Nigro's suicide, there had been no suicides or suicide attempts at the jail since 1998, the last year on record, and he personally does not recall any suicides or suicide attempts in over 20 years at the Strongsville City Jail. (Dkt. #21-6 at 2).

The Ohio Department of Rehabilitation and Correction maintains Minimum Standards for Jails in Ohio: Five Day Jails ("Minimum Standards"). (Dkt. #23-10). The Minimum Standards require that jails have a plan for identifying and responding to suicidal prisoners. (Dkt. #23-10 at 30-31). The suicide-prevention plan must have the following eleven components:

> (1) Identification - The receiving screening form contains observation and interview items related to the prisoner's potential suicide risk.
> (2) Training - Staff members who work with prisoners are trained to recognize verbal and behavioral cues that indicate potential suicide. The plan includes initial and annual training.
> (3) Assessment - The plan specifies a risk assessment, and level system. Only a qualified mental health professional may remove prisoners from suicide risk status.
> (4) Monitoring - The plan specifies the procedures for monitoring a prisoner who has been identified as potentially suicidal. A suicidal prisoner is checked at varied intervals not to exceed ten minutes. Regular documented supervision is maintained. Inmates are placed on a designated cell, all belongings removed, and other prevention precautions initiated as appropriate.
> (5) Referral - The plan specifies the procedures for referring potentially suicidal prisoner and attempted suicides to a mental health care provider or facility.
> (6) Communication - Procedures exist for ongoing written communication between health care and correctional personnel regarding the status of suicidal prisoners.
> (7) Intervention - The plan addresses how to handle a suicide in progress, including first aid measures.
> (8) Notification - The plan includes procedures for notifying the jail

> administrator, outside authorities, family members of completed or attempted suicides requiring medical hospitalization.
> (9) Reporting - The plan includes procedures for documenting, monitoring, and reporting attempted or completed suicides. Completed suicides are reported to the Bureau of Adulte detention within thirty days of the incident.
> (10) Review - The plan specifies procedures for medical and administrative review if a suicide or a serious suicide attempt, as defined by the suicide plan, occurs.
> (11) Critical Incident Debriefing - The plan specifies the procedures for offering critical incident debriefing to affected staff and prisoners.

(Dkt. #23-10 at 30-31).

Plaintiff disputes Strongsville's version of the facts in the following respects. Plaintiff alleges that Nigro was agitated and upset on multiple occasions during his detention, and often paced around the jail area. (Complaint ¶ 8). Plaintiff contends that Nigro was not observed as frequently as possible, even under the guidelines of Special Needs Watch, and that there are significant gaps of time in the cell log. (Dkt. #23-5). In addition, Plaintiff asserts that a suicide assessment sheet, required by the State of Ohio to be filled out upon reception of a prisoner, was not filled out in Nigro's case. (Dkt. #23-8 at 6-7). Plaintiff also alleges that jail employees were not given annual suicide-prevention training, as required by the Minimum Standards. (Dkt. #23-8 at 6).

Plaintiff's expert Lindsay M. Hayes ("Hayes") is the project director for the National Center on Institutions and Alternatives. (Dkt. #23-8 at 1). Hayes has extensive experience in jail-suicide prevention, including directing four United States Justice Department-funded studies of jail suicides and authoring over sixty publications about jail-suicide prevention. (Dkt. # 23-8 at 1, 9-25). Hayes concluded that Nigro exhibited symptoms commonly associated with suicidal persons and that jail employees chose an inadequate course of action in placing Nigro on Special Needs Watch, as

opposed to Suicide Watch. (Dkt. #23-8 at 4). Hayes also concluded that Strongsville's suicide-prevention policy was inadequate and did not comply with the Minimum Standards. (Dkt. #23-8 at 4-7). Hayes further concluded that there were significant gaps in Nigro's supervision on the day he died. (Dkt. #23-8 at 7).

Plaintiff filed the instant complaint naming only the City of Strongsville as a defendant. Plaintiff claims Strongsville is liable for damages on two separate counts. In Count 1, Plaintiff asserts a state law wrongful death claim under O.R.C. § 2744. In Count 2, Plaintiff alleges that Strongsville engaged in policies of gross neglect, recklessness, or deliberate indifference to the possibility of Nigro's suicide, and is consequently liable under 42 U.S.C. § 1983.

In its Motion for Summary Judgment, Strongsville asserts the following arguments. First, Strongsville argues that the corrections officers were not deliberately indifferent to the likelihood that Nigro would commit suicide. Second, Strongsville argues that it is not liable as a municipality because Plaintiff has not presented evidence that a municipal policy caused Nigro's death. Third, with respect to the state law claim, Strongsville argues that it is immune from liability in connection with the execution of a government function.

Plaintiff filed an Opposition to Summary Judgment and asserted three arguments with respect to her § 1983 claim. First, Plaintiff argues that Nigro was at risk for suicide and the corrections officers were aware of that risk. Second, Plaintiff argues that Strongsville's suicide prevention policies were inadquate under § 1983 because jail officials made no attempt to screen Nigro for suicidal tendencies. Third, Plaintiff argues that the jail officials did not observe Nigro with enough frequency to prevent his suicide. With regard to the state law claim, Plaintiff argues that Strongsville is not entitled to immunity under Ohio law.

**II.    LAW**

    **A.    Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ P. 56(c). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." Little v. BP Exploration & Oil Co., 265 F.3d 357, 361 (6th Cir. 2001). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. "A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56 (c)). For a dispute to be genuine, the evidence must be such that "a reasonable jury could return

a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

### B. Municipal Liability

Plaintiff sued Strongsville under 42 U.S.C. § 1983, which states, *inter alia*:

> Every person who, under the color of any statute, ordinance, regulation, custom or usage, of any State . . . , subjects, or cause to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

The statute does not create any substantive rights but provides a remedy for the deprivation of rights that are secured elsewhere. See Baker v. McCollan, 443 U.S. 137, 140 (1979).

Under § 1983, a municipality may only be held liable for the constitutional violations it actually causes; it cannot be held vicariously liable for the constitutional violations of its employees. Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978). Municipal liability can only be premised on injuries caused by a municipal "policy or custom." Id. at 694. Only when a decision is made pursuant to official municipal policy can a municipality be held responsible for that decision. Id. at 691. Furthermore, the city policy must be the "moving force" behind the alleged constitutional violation. See Polk County v. Dodson, 454 U.S. 312, 326 (1981).

A municipal decisionmaker must possess "final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, et al, 475 U.S. 469, 481 (1986). Although a decisionmaker might be authorized to exercise discretion in the execution of his duties, the exercise of that discretion, without more, will not form the basis for municipal liability under § 1983. Id. at 481-82.

Even when a city policy is itself constitutional, "there are limited circumstances in which an

allegation of 'failure to train' can be the basis for [municipal] liability under § 1983." City of Canton v. Harris, 489 U.S. 378, 387 (1989). Inadequate "police training may serve as a basis for § 1983 liability only when the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in to contact." Id. at 388. To satisfy this "deliberate indifference" standard, the challenged policy must be the course of action chosen from a number of alternatives by municipal policymakers. Id. at 389 (citing Tuttle, 471 U.S. at 823). The deficiency in training, and the likelihood that the deficiency will lead to violations of constitutional rights, must be so obvious to policymakers that their failure to train police properly can only be the product of deliberate indifference on the part of those policymakers. Id. at 390. Furthermore, even when a particular officer is improperly trained, municipal liability will not attach unless the policy itself is deficient. Id. at 391. Likewise, municipal liability will not attach when a properly trained officer causes a constitutional violation. Id.

For municipal liability to attach under § 1983, the deficient policy must be closely related to the constitutional injury, such that the injury would have been avoided had the employee been trained under an adequate program. Id. This causation requirement ensures that a municipality will be held liable for those constitutional violations it actually caused, rather than vicariously liable for the constitutional violations of its employees.

In Gray v. City of Detroit, 399 F.3d 612 (6th Cir. 2005), the Sixth Circuit considered a municipal liability claim under § 1983 that arose from a jail suicide and held that the city was not liable because a city policy or custom was not the "moving force" behind the violation of Gray's constitutional rights.

The Sixth Circuit affirmed the District Court's grant of summary judgment for the city and

held that, in the context of jail suicides, a municipality has a duty "to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable. Where such a risk is clear, the municipality has a duty to take reasonable steps to prevent the suicide." Id. at 618. A municipality does not have a duty, however, to take every possible measure to prevent jail suicides; the municipality's duty only extends to ensuring that city policies do not result in "deliberate indifference to foreseeable and preventable suicide attempts." Id. at 619.

The Court noted that only rarely will a municipality be liable for a jail suicide. One such situation, which the Court discussed, involved a suicide in a city jail that had played host to twenty suicides in the prior five years, fifteen of which were committed by individuals who were arrested for public intoxication. Id. at 618 (citing Simmons v. City of Philadelphia, 947 F.2d 1042 (3d Cir. 1991)). According to the Sixth Circuit, Simmons differed from Gray because, in the former case, city authorities were aware of a correlation between suicide and intoxication. Id. This "profile" was absent in Gray. Unlike in Simmons, where officers were completely unprepared to recognize this profile, there was no such deficiency in Gray. Id. While the plaintiff in Gray pointed to over twenty in-custody deaths in the eight year period preceding Gray's suicide, only two of those deaths were by suicide. Id. at 619. The Court concluded that the plaintiff was framing the issue incorrectly. The correct inquiry, in that case, was not the total number of in-jail deaths, but the number of in-jail suicides. Id. at 619. In affirming summary judgment for the city, the Court held that the city was not deliberately indifferent to the need for more or different suicide-prevention training. According to the Court, the lack of prior suicides provided no basis for the city to know that its policy was deficient. Id.

**III.    ANALYSIS**

   **A.    Plaintiff's § 1983 Claim**

To succeed in the instant case, Plaintiff must show that Strongsville caused Nigro's suicide. Plaintiff can do this in two ways. First, Plaintiff can show that the city's suicide-prevention policy was unconstitutional. Second, Plaintiff can show that the city failed to adequately train its officers to deal with the risk of detainee suicide.

   **1.    Strongsville's Suicide-Prevention Policy was not Unconstitutional**

Plaintiff asserts that Strongsville's suicide-prevention policy was one of gross neglect and recklessness, such that it was unconstitutional. Rather than developing this argument, however, Plaintiff simply concludes that Strongsville's procedures were a "summary of state standards[,] as opposed to an outline of required procedures." Plaintiff's Opposition at 13. The required procedures to which Plaintiff refers, however, are not explained in Plaintiff's Opposition Brief. Moreover, it is difficult to decipher exactly how "an outline of required procedures," as opposed to "a summary of state standards," would have better prepared jail employees to prevent Nigro's suicide.

Assuming *arguendo* that Strongsville's suicide-prevention policy did not meet the Minimum Standards, such a defect does not compel the conclusion that the policy was unconstitutional. The failure of a municipal policy to comply with a state standard is not itself a constitutional violation. See Davis v. Scherer, 468 U.S. 183 (1984). As Plaintiff has not alleged any independent reason to establish that Strongsville's suicide-prevention policy was unconstitutional, the Court finds that it was not unconstitutional.

Plaintiff also seems to identify as city policy several other decisions made by jail employees.[2] Plaintiff has not alleged that any of the employees responsible for handling Nigro's detention had any authority to enact policy on behalf of Strongsville. Nigro's classification was nothing more than jail employees exercising discretion in the execution of city policy. The decisions of jail employees were not policy decisions, and thus will not form the basis for municipal liability under § 1983. See Pembaur, 475 U.S. at 481-82.

### 2. Strongsville is not Liable Under a "Failure to Train" Theory

Under a failure-to-train theory, a plaintiff can succeed by showing that municipal policymakers enacted a training policy with deliberate indifference to the rights of detainees. See Harris, 489 U.S. at 388. In the context of jail suicides, to show that a municipality was deliberately indifferent in enacting a suicide-prevention policy, the plaintiff must show that policymakers ignored an obvious and foreseeable risk of suicide; a mere showing of negligence will not satisfy the "deliberate indifference" standard. See Gray, 399 F.3d at 618.

Plaintiff argues that Strongsville's suicide-prevention policy was unconstitutional under a failure-to-train theory because jail employees did not receive annual training in suicide prevention as required by the Minimum Standards. Therefore, according to Plaintiff, the jail employees were unprepared to identify Nigro as presenting an obvious risk of suicide during his detention.

There must be a causal link between the challenged policy and the constitutional violation.

---

[2] Both parties spend the bulk of their arguments on the wrong issue: Whether and to what extent the individual jail employees were responsible for Nigro's suicide. As the individuals discussed lack any policy-making authority, these arguments only affect whether Strongsville would be liable under a vicarious liability theory. Monell is very clear that a city will not be vicariously liable for the constitutional torts of its employees.

See Harris, 489 U.S. at 385. Specifically, Plaintiff asserts that had Strongsville trained its jail employees annually, as prescribed by the Minimum Standards, Nigro's suicide would have been prevented. Causation is only part of the inquiry. Plaintiff must also establish that the policy was the result of the deliberate indifference of the policymakers to the constitutional rights of detainees. In Gray, the Sixth Circuit concluded that the lack of a history of suicides in the Detroit jail shielded the city from § 1983 liability, under a failure-to-train theory, because that history – or lack thereof – gave city officials no basis on which to suspect that its policies were deficient. 399 F.3d at 619.

In the instant case, Plaintiff has not alleged that the Strongsville Jail has experienced any other suicides. In fact, the only evidence before the Court is the affidavit of Kobak who does not recall a suicide or suicide attempt in the jail the last twenty years. As in Gray, there was no history of suicides or suicide attempts from which Strongsville policymakers might have suspected that the city's suicide-prevention training was inadequate.

Plaintiff alleges that jail employees were deliberately indifferent to Nigro's constitutional rights because those employees were both aware of and failed to act on the obvious suicide risk that he posed. The accused employees are not parties to this action. This is not the proper inquiry because it focuses on the fault of the jail employees, not the fault of policymakers. "Pre-trial detainees do not have a constitutional right for cities to ensure, through supervision and discipline, that every possible measure be taken to prevent their suicidal efforts. Detainees have a right that city policies, training and discipline do not result in deliberate indifference to foreseeable and preventable suicide attempts." Id. at 619.

Plaintiff has provided no basis on which a reasonable jury could find that Strongsville was deliberately indifferent to Nigro's constitutional rights in enacting its suicide-prevention policy.

Therefore, the city is entitled to summary judgment on the § 1983 claim.

### B. Plaintiff's State Law Claim

The remaining claim is a state law claim for wrongful death.  As the Court has dismissed all federal claims against Strongsville, the Court, in its discretion, declines to exercise supplemental jurisdiction over the remaining state law claim asserted in the Complaint.  See 28 U.S.C. § 1367 (c)(3); see also United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966); Taylor v. First of America Bank - Wayne, 973 F.2d 1284, 1287 (6th Cir. 1992).  Accordingly, Plaintiff's remaining state law claim is **DISMISSED** without prejudice.

### IV. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment, (Dkt. # 21), is **GRANTED** and Plaintiff's claims are **DISMISSED**.

**IT IS SO ORDERED**.

 **/s/ Peter C. Economus –  October 29, 2007**
 **PETER C. ECONOMUS**
 **UNITED STATES DISTRICT JUDGE**